UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRISHA NEWMAN,<br><br>  Plaintiff,<br><br>  v.<br><br>COUNTY OF FRESNO, FRESNO COUNTY SHERIFF'S DEPARTMENT, and HERNANDEZ,<br><br>  Defendants. | No. 1:16-cv-01099-DAD-BAM<br><br>ORDER GRANTING MOTION FOR SUMMARY JUDGMENT<br><br>(Doc. No. 19) |

Plaintiff, the owner of a dog named Face, initiated this action by filing her complaint in this court on July 29, 2016. (Doc. No. 1.) In that complaint, plaintiff asserted causes of action under 42 U.S.C. § 1983 for violation of her Fourth Amendment rights against both Deputy Hernandez and the County of Fresno, as well as state law claims for trespass to chattel, conversion, negligence, and intentional infliction of emotional distress. (*Id*.) Defendants filed their answer on August 30, 2016. (Doc. No. 5.)

On June 14, 2017, defendants moved for summary judgment in their favor as to all of plaintiffs' causes of action. (Doc. No. 19.) Plaintiff filed an opposition to that motion on July 19, 2017, to which defendants replied on July 24, 2017. (Doc. Nos. 20, 21.) A hearing was held on the motion on August 1, 2017, at which attorney Jill Ryther appeared on behalf of plaintiff and

/////

1

attorney Leslie Dillahunty appeared on behalf of defendants.[1]  For the reasons discussed below, the court will grant defendants' motion for summary judgment in its entirety.

## BACKGROUND

The factual background of this case is largely undisputed.[2]  On the morning of August 6, 2015, Fresno County Sheriff's Department deputies responded to a welfare call reporting that a small child around the age of two years old had been crying alone in the backyard of a house for about thirty minutes.  (Doc. No. 19-3 at ¶ 1; Doc. No. 20-2 at ¶ 1.)  A welfare call or welfare check is a Priority One call.  (Doc. No. 19-3 at ¶ 3.)  Deputies Michael Hernandez and Javier Puente were dispatched to conduct the welfare check.  (*Id.* at ¶ 4.)  The deputies first priority was to "find and assure the safety of the child."  (Doc. No. 20-2 at ¶ 3.)

/////

---

[1]  At the hearing the court granted plaintiff seven days to supplement the record with evidence not already submitted, and provided defendant seven days to reply.  (Doc. No. 24.)  In accordance with the court's order, plaintiff filed a supplemental opposition to the pending motion, which included two expert reports from plaintiff's expert James Crosby and a surveillance video.  (Doc. No. 25 at 2.)  Defendants filed a response on August 15, 2017, objecting to the court's consideration of Mr. Crosby's reports in their entirety, as well as to any improper legal conclusions contained therein.  (Doc. No. 27.)

[2]  In the response to defendants' statement of undisputed material facts, plaintiff denied certain facts.  (*See, e.g.*, Doc. No. 20-2 at ¶ 2) (stating "Deny.  Disputed by Plaintiff.").  However, none of plaintiff's responses to the statement of undisputed facts included any citations to evidence showing a particular fact is genuinely disputed.  As the party opposing summary judgment, it is plaintiff's obligation to point the court to particular evidence that shows a genuine dispute of material fact remains to be resolved by a jury.  *See* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record"); Local Rule 260(b) ("Any party opposing a motion for summary judgment . . . shall reproduce the itemized facts in the Statement of Undisputed Facts and . . . deny those that are disputed, *including with each denial a citation to the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission, or other document relied upon in support of that denial.*") (emphasis added); *see also Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) ("[E]ven if an affidavit is on file, a district court need not consider it in opposition to summary judgment unless it is brought to the district court's attention in the opposition to summary judgment.").  As discussed at the hearing, because plaintiff's counsel was mistaken about what evidence was before the court, plaintiff was given an opportunity to supplement the record.  Notwithstanding plaintiff's failure to point to specific evidence establishing a factual dispute, the court has reviewed all of the evidence submitted on summary judgment.  Pertinent factual disputes for which there is evidentiary support are discussed as necessary below.

When the deputies arrived in the neighborhood, they saw an adult standing behind the chain link fence of a neighboring house, who advised them that the child was still by herself in the back yard. (Doc. No. 19-4 at 11–12; Doc. No. 19-5 at ¶ 5.) The deputies recognized the house in question, because they had responded to two complaints of criminal activity—specifically, pursuit of a suspect after a purported automobile theft and a separate purported narcotics incident—at the house previously. (Doc. No. 19-4 at 5–9.) Because the call was a Priority One welfare check and he was concerned about the safety and well-being of the child, Deputy Hernandez elected to make sure the child was safe prior to contacting anyone in the house. (Doc. No. 19-5 at ¶ 7.) Deputy Hernandez did not recall having seen dogs at the house during any of his prior visits, but upon approaching the house saw a medium sized dog pulling against its leash in the back yard. (Doc. No. 20-2 at ¶¶ 6–7.) Unknown to the deputies, however, there was another dog roaming freely in the back yard. (*Id.* at ¶ 11.) Prior to entering the back yard, Deputy Hernandez kicked the gate to attempt to determine if there were any additional dogs in the back yard. (*Id.* at ¶ 15.) Kicking the gate elicited no response prior to Hernandez entering the back yard.

Deputy Hernandez then entered the back yard and called softly to the child, who remained alone but had ceased crying, motioning for her to come to him. (*Id.* at ¶ 18.) At approximately the same time, a second, unrestrained dog—a medium sized pit bull mix—emerged. (*Id.* at ¶ 19; Doc. No. 19-4 at 24.) This dog, named Face, barked, growled, and advanced toward Deputy Hernandez while baring its teeth and tensing its muscles, which caused the deputy to kick at it and yell. (Doc. No. 19-4 at 20, 22, 30–31.) The kicking and yelling did not deter the dog, who continued advancing toward Deputy Hernandez in the same manner. (*Id.* at 21–23; 30–31.) Deputy Hernandez shot the dog twice, mortally wounding it. (Doc. No. 20-2 at ¶ 26.) The dog then ran toward the gate leading out onto the street, and Hernandez shot the dog a third time, concerned it would exit the yard. (Doc. No. 19-4 at 13–15.)

After the shots were fired, plaintiff's boyfriend, Ryan Covey, emerged from the house and yelled at Deputy Hernandez for shooting his dog. (Doc. No. 19-3 at ¶ 8.) Mr. Covey then directed Deputy Hernandez to shoot the dog again to euthanize it, a request with which Deputy

Hernandez complied.  (Doc. No. 20-2 at ¶ 29.)  At the time of the incident the child's mother, Jackie, was sleeping in a travel trailer south of the main residence and did not hear either the gunshots or her daughter crying in the yard.  (Doc. No. 20-2 at ¶ 30; Doc. No. 19-3 at ¶¶ 9–10.)

The Fresno County Sheriff's Office maintains written shooting policies, which state in part:

> It is the policy of the Fresno County Sheriff's Office to resort to the use of a firearm under law, when it reasonably appears to be necessary.
>
> . . .
>
> Members of the Sheriff's Office may resort to the use of a firearm pursuant to law, when it reasonably appears to be necessary, and generally: A. An officer may use deadly force to protect themselves or others from what they reasonable believe would be an immediate threat of death or serious bodily injury.
>
> . . .
>
> Members of the Sheriff's Office may resort to the use of a firearm pursuant to law, when it reasonably appears to be necessary, and generally: C. To stop a dangerous animal. 1. In circumstance where officers encounter an unexpected dangerous animal or are surprised by an animal which reasonably appears to pose an imminent threat to the safety of the officer or others, officers are authorized to use deadly force to neutralize such a threat.

(Doc. No. 20-2 at ¶¶ 35–37.)

## LEGAL STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

In summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a

genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment."). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Wool v. Tandem Computs., Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all reasonable inferences supported by the evidence in favor of the non-moving party." *Walls v. Cent. Contra Costa Cty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987). Undisputed facts are taken as true for purposes of a motion for summary judgment. *Anthoine v. N. Cent. Counties Consortium*, 605 F.3d 740, 745

(9th Cir. 2010). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

**ANALYSIS**

Defendants assert that there is no genuine dispute of material fact concerning any of the claims raised by plaintiff here, and that judgment should be awarded in their favor. The court will consider each of the causes of action in turn below.

**A.     § 1983 Claims**

Plaintiff's sole Fourth Amendment claim against defendant Deputy Hernandez[3] alleges he "violated the Fourth Amendment by unreasonably depriving Plaintiff of her personal property and animal companion, Face, through his unlawful destruction." (Doc. No. 1 at ¶ 54.) Additionally, plaintiff alleges a claim under *Monell* against the County of Fresno and the Fresno County Sheriff's Department (together referred to as the "County"), claiming they have a policy "of allowing the employees of the Fresno County Sheriff[']s Department to disregard the lives of

---

[3] Plaintiff does not assert a separate Fourth Amendment claim based upon the mere entrance of the deputies into the back yard. (*See* Doc. No. 1 at ¶¶ 51–54, 56) (alleging Deputy Hernandez violated plaintiff's Fourth Amendment rights by destroying her dog). Instead, plaintiff claims that the deputies' entry into the back yard is evidence of the unreasonableness of Deputy Hernandez's conduct in shooting her dog. The decision not to pursue such a claim is well taken. While the Fourth Amendment generally protects against warrantless entries into the curtilage of a home, *see United States v. Perea-Rey*, 680 F.3d 1179, 1185 (9th Cir. 2012), there is a well-recognized exception where exigent circumstances exist. *See Kentucky v. King*, 563 U.S. 452, 460 (2011) ("One well-recognized exception applies when 'the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment.'") (quoting *Mincey v. Arizona*, 437 U.S. 385, 394 (1978)). Welfare checks generally constitute grounds for exigent circumstances so long as there is probable cause that an emergency situation exists to justify the warrantless entry. *See White v. Pierce County*, 797 F.2d 812, 815–16 (9th Cir. 1986) (recognizing that exigent circumstances plus probable cause to believe child might be injured was sufficient to justify warrantless entry); *cf. Calabretta v. Floyd*, 189 F.3d 808, 816–17 (9th Cir. 1999) (contrasting the decision in *White* and noting no authority to enter without a warrant for the purpose of conducting welfare checks absent exigent circumstances and probable cause to believe injury could occur). Here, it is undisputed a two-year old child had been crying alone outside of the house for more than 30 minutes, which would support a finding of exigency. However, the court need not make that finding since no such a claim is alleged in plaintiff's complaint.

companion animals, resulting in the destruction of citizens' personal property without lawful justification." (*Id.* at ¶ 52.)

"'The killing of [a] dog is a destruction recognized as a seizure under the Fourth Amendment' and can constitute a cognizable claim under § 1983." *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose* (*Hells Angels*), 402 F.3d 962, 975 (9th Cir. 2005) (quoting *Fuller v. Vines*, 36 F.3d 65, 68 (9th Cir. 1994), *overruled on other grounds by Robinson v. Solano County*, 278 F.3d 1007, 1013 (9th Cir. 2002)); *see also Flint v. City of Milwaukee*, 91 F. Supp. 3d 1032, 1042 (E.D. Wis. 2015) (noting that "'[e]very circuit that has considered the issue has held that the killing of a companion dog constitutes a seizure within the meaning of the Fourth Amendment'") (quoting *Viilo v. Eyre*, 547 F.3d 707, 710 (7th Cir. 2008)); *Thomas v. Cannon*, 289 F. Supp. 3d 1182, 1221 (W.D. Wash. 2018); *Hardan v. Nye County*, No. 2:15-CV-0470-GMN-PAL, 2017 WL 4349228, at *9 (D. Nev. Sept. 28, 2017) (characterizing the Ninth Circuit's statement in *Hells Angels* as "clearly established law"). "[T]he killing of a dog is a severe intrusion into a person's Fourth Amendment interest because 'dogs are more than just a personal effect . . .'" *Gregory v. City of Vallejo*, 63 F. Supp. 3d 1171, 1178 (E.D. Cal. 2014) (quoting *Hells Angels*, 402 F.3d at 975); *Thomas*, 2018 WL 623670, at *27.

"Reasonableness is the touchstone of any seizure under the Fourth Amendment." *Hells Angels*, 402 F.3d at 975. To comply with the Fourth Amendment, the shooting of the dog must therefore have been reasonable under the totality of the circumstances. *Id.* Seizures become unlawful when they are "more intrusive than necessary." *Id.* (quoting *Ganwich v. Knapp*, 319 F.3d 1155, 1122 (9th Cir. 2003)). Thus, in examining the reasonableness of a seizure, the court must balance "'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)); *see also Gregory*, 63 F. Supp. 3d at 1177–78; *Harden,* 2017 WL 4349228, at *8. Accordingly, courts look to the totality of the circumstances "to determine whether the destruction of property was reasonably necessary to effectuate the performance of the law enforcement officer's duties." *Harden,* 2017 WL 4349228, at *8 (quoting *Hells Angels*, 402 F.3d at 975).

In determining whether the killing of a dog to protect officer safety was reasonable, courts have taken into account numerous factors in assessing the totality of the circumstances facing the officer. This may include the demeanor of the dog at the time of the incident, such as whether it appeared aggressive by barking and snarling. *Gregory*, 63 F. Supp. 3d at 1178 (noting that the dog was barking, snarling, showing its teeth, and had its hair raised on the back of its neck with its tail straight as opposed to wagging). Courts have also considered any countervailing evidence presented by plaintiffs that would support a conclusion the dog was actually friendly and non-aggressive. *Id.* at 1178–79 (noting that a genuine issue of fact existed because plaintiff came forward with a declaration stating the dogs were observed to be friendly and never showed aggression over a three-year period); *Niesen v. Garcia*, No. 2:14-2921 WBS CKD, 2016 WL 4126382, at *7 (E.D. Cal. July 5, 2016) (noting that plaintiff provided evidence that the dogs were friendly and that during twenty to thirty encounters over the course of several years, they had never seen the dogs be aggressive). In addition, whether the officers had advance knowledge of a dog's presence on the premises factors strongly into the reasonableness of the shooting. *See Hells Angels*, 402 F.3d at 977 ("While the governmental interest of safety might have provided sound justification for the intrusion had the officers been surprised by the presence of the dogs, the same reasoning is less convincing given the undisputed fact that the officers knew about the dogs a week before they served the search warrants."); *see also Niesen*, 2016 WL 4126382, at *9 (finding the officer's conduct reasonable in part because they had no knowledge that the dogs were on the premises); *Perez v. City of Placerville*, No. CIV. S-07-927 FCD GGH, 2008 WL 4279386, at *8 (E.D. Cal. Sept. 9, 2008) (finding that since exigent circumstances existed, the officers acted reasonably where they did not have a week to plan the search and had no confirmation about the presence of a dog upon arrival despite making sounds to elicit a response). Courts may also consider whether officers took less drastic alternative measures prior to killing the dog, though the availability of such measures is not dispositive. *See Gregory*, 63 F. Supp. 3d at 1179 (noting that a genuine dispute existed as to the reasonableness of the officer's actions because both a Taser and pepper spray were available to him); *see also Niesen*, 2016 WL 4126382, at *9 (finding the officer's conduct reasonable because he took less intrusive measures

before shooting the dog); *cf. McCarthy v. Kootenai County*, No. CV08-294-N-EJL, 2009 WL 3823106, at *6 (D. Idaho Nov. 12, 2009) ("An officer need not use the least harmful alternative in dealing with a dangerous situation in which officer safety is an issue. Requiring the least intrusive alternative is not a realistic approach where law enforcement officers have to make split second decisions regarding their safety."). The breed of the dog, its size, and its characteristics for aggressive behavior may also factor into the reasonableness inquiry. *See Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 572 (6th Cir. 2016) (emphasizing the dog's breed and taking into account "the nature and size of the dogs"); *Altman v. City of High Point*, 330 F.3d 194, 206 (4th Cir. 2003) (considering the fact that the dog in question was "part pit bull, and pit bulls, like Rottweilers, are a dangerous breed of dog"); *Niesen*, 2016 WL 4126382, at *10 (noting that, "[t]he deputies were also dealing with a breed of dog, [a pitbull], that is known for fighting, aggressive behavior, and causing serious injury"). Ultimately, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

Here, while the reasonableness of Deputy Hernandez's actions is disputed, the actual actions he took are not. Deputy Hernandez was responding to a Priority One welfare check called in by a neighbor, who had reported there was a child of approximately two years old who had been crying in the back yard of the house alone for approximately 30 minutes. Deputy Hernandez recognized the residence from prior calls reporting criminal activity at that address. The deputies did not knock on the front door to ascertain whether anyone was home, and instead reasonably responded directly to the back yard where the child was located. Upon reaching the back gate, the deputies saw a dog tied up in the back yard, barking and straining against its leash. Deputy Hernandez kicked the gate to ascertain whether there were other loose dogs in the yard, and no dogs emerged in response. Deputy Hernandez entered the yard through the gate and walked around the back of the house. Upon seeing the child sitting behind the house, Hernandez motioned for the child to come to him. Almost immediately upon his doing so, a dog emerged and advanced toward Hernandez. Deputy Hernandez kicked at the dog, which continued to

advance upon him. Immediately after kicking at the dog and being unsuccessful in slowing its advance, Hernandez shot the dog twice, mortally wounding it. The dog then fled toward the gate through which Hernandez had just entered the yard. Deputy Hernandez then shot the wounded dog a third time.

The Supreme Court has addressed the role of videotape evidence on summary judgment, observing in one case as follows:

> Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

*Scott v. Harris*, 550 U.S. 372, 380–81 (2007). The court is mindful of this admonition. Here, there is a video recording of the incident in question which is largely consistent with the events as recounted by the deputies. The video is exactly one minute in length and depicts Deputy Hernandez approaching the gate and kicking it forcefully. Approximately twenty seconds elapse thereafter before Deputy Hernandez is seen entering the back yard. No dogs are seen on screen during that twenty second period. Deputy Hernandez is then shown walking around the corner of the house and motions to the two-year-old child, who is off-screen. Within approximately three seconds thereafter, Deputy Hernandez's attention shifts and he is seen sticking his foot out toward a pit-bull that approaches him rapidly from off-screen. The demeanor of the dog is not captured on the video recording. The dog moves around Deputy Hernandez's foot toward the officer's left side, staying within a few feet of the deputy. Within approximately two seconds thereafter, Deputy Hernandez is shown drawing and firing his weapon at the dog. Upon being hit, the dog turns and flees toward the open gate.[4] Deputy Hernandez is then seen walking toward the dog and shooting it again.

Here, Deputy Hernandez was responding to an emergency call of a small, unattended two-year-old child who had been crying alone outside of a house for thirty minutes. The deputy had

---

[4] The parties dispute whether the gate to the yard was open, but the court finds that this dispute is not genuine. The video of the incident clearly shows that the gate remained open after the officers entered the back yard. Plaintiff cannot create a dispute of fact where her version of the events is thoroughly contradicted by the video evidence. *See Scott*, 550 U.S. at 380–81.

no prior knowledge there was a dog loose in the back yard, and took steps by kicking the fence to ascertain whether there was such a dog. Kicking the fence garnered no response, from which a reasonable officer would have concluded there were no loose dogs in the yard. After entering the back yard, the entire encounter between the time Deputy Hernandez noticed the loose dog and when he fired at the dog lasted no more than 10 seconds. The dog he encountered was a medium-sized pitbull, which courts have noted are an aggressive breed of dog bred for fighting. Moreover, the dog acted aggressively toward the deputy, advancing rapidly while barking, growling and tensing its muscles. Thus, the deputy was confronted with a rapidly developing situation in which immediate action was required to ensure his own safety. Given this evidence, no reasonable jury could conclude that Deputy Hernandez's actions were unreasonable.

Plaintiff's counsel argued at the hearing on the pending motion that four separate disputed issues of fact require a jury to resolve whether Deputy Hernandez acted reasonably under the circumstances that were presented here: (1) the fact that Deputy Hernandez entered the back yard without first knocking on the front door of the house; (2) the third shot fired by Deputy Hernandez, which occurred after the dog had moved away from him; (3) the fact that Deputy Hernandez had alternative, non-lethal types of force he could have used against the dog; and (4) that Deputy Hernandez forced plaintiff and the child to stay outside after the dog had been shot. First, as discussed above, plaintiff does not bring a separate claim alleging Deputy Hernandez's entry into the back yard, in and of itself, violated her rights under the Fourth Amendment. Rather, she asserts that the failure to knock on the front door of the house indicates Deputy Hernandez acted unreasonably under the circumstances in shooting the dog. Even if one could argue, in hindsight, that it may have been appropriate for the deputy to first knock on the front door of the home, his failure to do so does not render Deputy Hernandez's subsequent shooting of the dog unreasonable. *See Graham*, 490 U.S. at 396 ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."). Moreover, Deputy Hernandez recognized this residence because he had twice before responded to reports of serious criminal activity there, including a suspect fleeing after a purported automobile theft and a report of narcotics activity. Further, he was

11

responding in this incident to a report of a young child crying outside the house alone for an extended period of time. Upon arriving on the scene, the reporting party advised him that the small child was still outside the home and still alone. Deputy Hernandez had no knowledge that there was a loose dog in the yard, and attempted to ascertain whether there were any loose dogs in the yard prior to entering. Under these circumstances, it was reasonable for Deputy Hernandez to first ascertain that the small child was safe prior to inquiring whether anyone was inside the residence.

Concerning less lethal forms of force, Deputy Hernandez testified that he had both pepper spray and a baton available to him that day. (Doc. No. 19-4 at 23.) However, at least in cases involving a potentially imminent dog attack, it has been recognized that "an officer need not use the least harmful alternative in dealing with a dangerous situation in which officer safety is an issue." *McCarthy*, 2009 WL 3823106, at *6; *see also Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010) ("[T]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.") (quoting *Graham*, 490 U.S. at 396–97); *cf. Hells Angels*, 402 F.3d at 978 (upholding a denial of qualified immunity because "this case is not the kind where the officer was reacting to a sudden unexpected situation, where the officers were confronted with exigent circumstances"). The court has reviewed the video footage of this incident, and the entire encounter between Deputy Hernandez and the dog lasted only a few seconds. While it is possible the deputy could have readied a different force option prior to entering the back yard, as suggested by plaintiff's expert (*see* Doc. No. 25-2 at 11), such an action can only be characterized as necessary in hindsight. Deputy Hernandez attempted to ascertain whether there were any loose dogs in the back yard before he entered it. Having elicited no response to kicking the gate, it was reasonable for Deputy Hernandez not to draw a non-lethal force option as he approached the small child, just as he did not enter the back yard with his service weapon drawn. Further, once the unforeseen dog appeared and advanced upon him, there was insufficient time or opportunity for the deputy to
/////

12

either make a calculated decision about the appropriate level of force to use or reliably access other means to defend himself.

The court need not discuss plaintiff's remaining two arguments at length. To the extent plaintiff contends that her Fourth Amendment claim can rest on the fact that Deputy Hernandez shot her dog a third time, the court notes that it is undisputed the first two shots mortally wounded the animal. No authority has been presented to the court suggesting that an otherwise reasonable use of force against an aggressive dog can be rendered unreasonable because an extra shot was fired beyond what was arguably necessary to stop the attack. Moreover, here the evidence on summary judgment establishes that the dog was running toward the open gate, and Deputy Hernandez testified he shot the dog again to keep it from exiting the property, thereby protecting against any threat to the general public posed by a wounded aggressive dog. (Doc. No. 19-4 at 14–15.) Indeed, in a different context the Supreme Court has rejected the argument that the number of shots fired can render an otherwise permissible use of deadly force unreasonable. *See Plumhoff v. Rickard*, __ U.S. ___, ___, 134 S. Ct. 2012, 2022 (2014) ("We now consider respondent's contention that, even if the use of deadly force was permissible, petitioners acted unreasonably in firing a total of 15 shots. We reject that argument. It stands to reason that, if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended."). Here, the video evidence before the court on summary judgment shows the dog moving quickly, after being shot twice, toward the open gate through which Deputy Hernandez had just passed. Since the deputy's use of lethal force was reasonable, the fact that he fired one additional time to prevent the wounded dog from running loose from the property does not render it unreasonable.

Similarly, the argument that the deputy's requiring the plaintiff and the small child to remain outside *after* the dog had been shot somehow renders an otherwise permissible use of force unreasonable is wholly unpersuasive. The seizure at issue here is the deputy's use of lethal force against plaintiff's dog. *See Hells Angels*, 402 F.3d at 975 ("[T]o comply with the Fourth Amendment, *the seizure—in this case, shooting and death—*of the [plaintiff's] dogs must have been reasonable under the circumstances.") (emphasis added). That seizure had irreversibly

13

occurred by the time plaintiff was instructed by deputies to remain outside. Moreover, plaintiff has not brought any claims alleging that her detention following the shooting of her dog was an unlawful seizure within the meaning of the Fourth Amendment.

In short, no reasonable jury could conclude from the evidence presented on summary judgment that Deputy Hernandez acted unreasonably in his use of force against plaintiff's dog. Given this finding, the court need not address whether Deputy Hernandez is entitled to qualified immunity. In addition, summary judgment must be granted in favor of defendants as to plaintiff's *Monell* claims against Fresno County and the Fresno County Sheriff's Department because there was no unconstitutional deprivation of property. *See Sweaney v. Ada County*, 119 F.3d 1385, 1392 (9th Cir. 1997) ("While the liability of municipalities doesn't turn on the liability of individual officers, it is contingent on a violation of constitutional rights.") (quoting *Scott v. Henrich*, 39 F.3d 912, 916 (9th Cir. 1994)); *McCarthy*, 2009 WL 3823106, at *7 (dismissing claims against a municipality because the court found no violation of the plaintiff's Fourth Amendment property rights had occurred); *cf. McGowan v. County of Kern*, No. 1:15–cv–01365–DAD–SKO, 2018 WL 2734970, at *11–12 (E.D. Cal. June 7, 2018) (discussing when *Monell* claims may proceed against municipalities absent claims against any individual officers).

### B. State Law Claims

This case was originally filed in this court on the basis of federal question jurisdiction. (*See* Doc. No. 1 at ¶ 1.) The court has concluded that summary judgment must be granted in favor of defendants as to plaintiff's federal claims, leaving only state law causes of action remaining.

Once all federal claims have been dismissed from a case, whether to retain jurisdiction over any remaining state law claims is left to the discretion of the district court. *See* 28 U.S.C. § 1367(c)(3); *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1000 (9th Cir. 1997); *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 537 (9th Cir. 1989). Generally, if federal claims are dismissed prior to trial, state law claims should be remanded to state court "both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966); *see also Carnegie-Mellon Univ.*

14

*v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."); *Acri*, 114 F.3d at 1000. If the court declines to exercise supplemental jurisdiction over the state-law claims in a case initially filed in federal court, the court must dismiss those claims without prejudice. *See Carnegie-Mellon Univ.*, 484 U.S. at 350–51 ("When the balance of these factors indicates that a case properly belongs in state court, . . . the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice . . . [where] the plaintiff [has] filed his suit in federal court, remand [is] not an option."). The factors to be weighed are "the values of judicial economy, convenience, fairness, and comity." *Id.* at 350.

Here, while judicial economy might arguably be served by retaining jurisdiction over plaintiff's state law claims, the court concludes that the exercise of supplemental jurisdiction is not warranted in this case. The parties have raised multiple arguments related to the application of California law, including a self-defense claim to a cause of action for trespass to chattels, the application of various California immunity statutes, and the sufficiency of the evidence necessary on plaintiff's claim for intentional infliction of emotional distress. These disputes are best determined by state courts, since the role of the federal courts in addressing state law claims is to attempt to divine how the California Supreme Court would determine any particular issue. *See Vernon v. City of Los Angeles*, 27 F.3d 1385, 1391 (9th Cir. 1994) ("Where the state supreme court has not spoken on an issue presented to a federal court, the federal court must determine what result the state supreme court would reach based on state appellate court opinions, statutes, and treatises."). This is a task for which the state courts are better suited and declining to exercise supplemental jurisdiction under such circumstances is appropriately respectful of the dual sovereignty of the federal government and the state of California. Moreover, since this is the first motion filed in this case on which the court has ruled, judicial economy does not compel the exercise of supplemental jurisdiction over plaintiff's remaining state law claims. Similarly, both parties are located in California and are represented by California lawyers, thereby minimizing any concerns of convenience or fairness. In sum, the court finds the interests of comity and

justice are best served by this court declining the exercise of supplemental jurisdiction over these remaining state law claims.⁵ Plaintiff's state law claims will therefore be dismissed without prejudice.

**CONCLUSION**

For the reasons detailed above,

1. Defendants' motion for summary judgment (Doc. No. 19) is granted as to all of plaintiff's constitutional claims brought pursuant to 42 U.S.C. § 1983;

2. The court declines to exercise supplemental jurisdiction over plaintiff's remaining state law claims and those claims are dismissed without prejudice; and

3. The Clerk of the Court is directed to enter judgment as to the § 1983 claims and close this case.

IT IS SO ORDERED.

Dated: **July 20, 2018**

_____
UNITED STATES DISTRICT JUDGE

---

⁵ This conclusion is aided by the recognition that any applicable statute of limitations under state law has been tolled during the pendency of this litigation. *See* 28 U.S.C. § 1367(d) (tolling the limitation period for any claim asserted in a federal action by way of supplemental jurisdiction both while the claim is pending "and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period"); *Artis v. District of Columbia*, ___ U.S. ___, ___, 138 S. Ct. 594, 598 (2018) ("We hold that § 1367(d)'s instruction to 'toll' a state limitations period means to hold it in abeyance, i.e., to stop the clock.").